UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

    Plaintiff,

and                                                         Case No. 5:03-cv-150

JEFF L. CARTER,                                 Hon. Wendell A. Miles

    Plaintiff-Intervenor,

v

ROBERT BOSCH CORPORATION,

    Defendant.
_____/

OPINION AND ORDER ON PLAINTIFF EEOC'S MOTION FOR RECONSIDERATION

       Plaintiff the Equal Employment Opportunity Commission ("EEOC") filed this action against defendant Robert Bosch Corporation ("Bosch" or "the company"), alleging that Bosch violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. The EEOC's claim is that Bosch discriminated against a former employee, Jeff Carter, on the basis of his religion by requiring him to work overtime on his Sabbath day and terminating him after he accumulated unexcused absences by refusing to work the scheduled overtime. Carter has been granted leave to intervene as a plaintiff in the action.

       On October 21, 2004, the court issued a decision granting Bosch's motion for summary judgment. The matter is currently before the court on motions by both Carter and the EEOC for

reconsideration (docket nos. 84 and 89) of that decision.  For the reasons to follow, the court **DENIES** the motions.

## Discussion

In its lengthy Opinion and Order (docket no. 81), the court concluded that Bosch was entitled to summary judgment because the evidence showed that Bosch had offered the option of using volunteers to work overtime for Carter on his Sabbath; that there were no volunteers; and that the use of volunteers was, as a matter of law, a reasonable accommodation, even though the employee's collective bargaining representative – here, Local 383 of the International Union of Automobile Workers of America ("the Union") – could not find volunteers willing or able to volunteer.

In its motion, the EEOC expressly relies on Fed.R.Civ.P. 59(e) and W.D. Mich. L.Civ.R. 7.4(a).[1]  A district court may grant reconsideration under Fed.R.Civ.P. 59(e) for any of four reasons: (1) because of an intervening change in the controlling law; (2) because evidence not previously available has become available; (3) to correct a clear error of law; or (4) to prevent manifest injustice.  See <u>GenCorp, Inc. v. American Int'l Underwriters</u>, 178 F.3d 804, 834 (6th Cir.1999).  In addition, W.D. Mich. L.Civ.R. 7.4(a) provides that a movant seeking reconsideration "shall not only demonstrate a palpable defect by which the Court and the parties have been misled, but also show that a different disposition of the case must result from a correction thereof."[2]

---

[1] In his own motion for reconsideration, Carter merely joins in the arguments made by the EEOC.

[2] The EEOC's brief (docket no. 90) filed in support of its motion for reconsideration
(continued...)

2

In support of its request for relief, the EEOC raises a number of arguments, which can essentially be divided into two separate categories: (1) the court erred in concluding that the Supreme Court's opinions in Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 107 S.Ct. 367 (1986) and Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264 (1977) supported the entry of summary judgment in favor of Bosch, and (2) the court erred in concluding that the facts of record supported that decision.

In its decision granting summary judgment in favor of Bosch, the court concluded that the issue in Hardison was virtually identical to that presented here: "the extent of the employer's obligation under Title VII to accommodate an employee whose religious beliefs prohibit him from working on Saturdays." Opinion and Order at 8 (citing Hardison, 432 U.S. at 66, 97 S.Ct. at 2268).

In Hardison, the Supreme Court observed that the seniority system contemplated by the collective bargaining agreement "itself represented a significant accommodation to the needs, both religious and secular, of all [the company's] employees" because such a system "represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off." Id., 432 U.S. at 78, 97 S.Ct. at 2274. According to the Court, its conclusion was "supported by the fact that seniority systems are afforded special treatment under Title VII itself[,]" namely under 42 U.S.C. § 2000e-2(h). Hardison, 432 U.S. at 81-82, 97 S.Ct.

---

²(...continued)
consists of 27 pages of text, which not only exceeds the number of pages contained in its earlier brief in response (25 pages, docket no. 72), but also exceeds the number of pages permitted by Local Rules for dispositive motions. See W.D. Mich. LCivR 7.2(b). Despite its length, the brief contains three footnotes (8, 9, and 15) which appear to be incomplete. Although the Local Rules do not precisely specify page limits for briefs submitted in support of motions for reconsideration, the Rules do provide that motions "which merely present the same issues ruled upon by the Court shall not be granted." W.D. Mich. LCivR 7.4(a).

at 2275.  The Court reiterated that it was concluding that the company "was not required by Title VII to carve out a special exception to its seniority system in order to help [the plaintiff] to meet his religious obligations."  Id., 432 U.S. at 83, 97 S.Ct. at 2276.  In construing similarly worded statutes, the Supreme Court has noted that neutral seniority systems – collectively bargained or otherwise – are generally sufficient to show reasonable accommodation.  See U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 403-405, 122 S.Ct. 1516, 1524-1525 (2002) (construing Americans with Disabilities Act).

     In this case, the Union's collective bargaining agreement ("CBA") with Bosch contained a provision requiring "equalization of overtime."   This provision also required that an employee in an overtime group with the lowest number of overtime hours on a shift would be scheduled to work, qualifications permitting.  In other words, employees with the least number of accumulated overtime hours had to be given overtime before their co-workers could again be required by the company to work overtime.  The CBA contained provisions for the posting of substitute overtime sign-up lists to reduce mandatory overtime and to help equalize "out of class" overtime.  In addition, the CBA also permitted employees to "volunteer" for "out of class" overtime in another department by completing a required form.  EEOC's Brief in Opposition, Exhibit 6 (Article XVI of CBA), at 48-56.

     The CBA's requirement for "equalization" of overtime essentially amounted to an objective, neutral system in which the number of accumulated overtime hours was the primary consideration in determining who would be assigned overtime – if other arrangements could not be made with "out-of-class" employees on a purely voluntary basis.  The system was much like that contemplated by Hardison, representing a "neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off."  See id., 432

4

U.S. at 78, 97 S.Ct. at 2274. Generally, a company's use of a "neutral system such as seniority, a lottery, or rotating shifts" will establish reasonable accommodation. Hardison, 432 U.S. at 80, 97 S.Ct. at 2275.

The EEOC argues that neither Hardison or Ansonia permit an employer to avoid liability by proposing an accommodation that "does **not** work." According to the EEOC, in order to be reasonable, an accommodation has to completely eliminate the conflict between the employee's work obligations and his religious ones. However, neither Hardison nor Ansonia holds that Title VII requires an employer to completely eliminate all conflicts. Nor does Smith v. Pyro Mining Co., 827 F.2d 1081 (6th Cir. 1987), on which the EEOC relies. In Smith, the Sixth Circuit considered "whether an employer reasonably accommodates an employee by allowing the employee to arrange a shift trade himself when the employee considers it a sin to arrange such a swap." Id. at 1088. A majority of the panel in Smith concluded that this was not a reasonable accommodation. However, neither the EEOC nor Carter has contended that Carter considered it a "sin" for Carter, or the Union acting on his behalf, to seek other employees to work for Carter on his Sabbath. Moreover, the decision in Smith contains no indication that the employer was subject to a collective bargaining agreement. Smith simply does not require the conclusion that only an accommodation which eliminates all conflict between employment and religious observance is reasonable. As one court has noted,

> Any voluntary system is at the mercy of its volunteers; the system will not work perfectly should co-workers be unwilling to swap. However, despite this possibility that voluntary swaps will not always resolve a scheduling conflict, courts have held that the programs are reasonable accommodations.

Moore v. A.E. Staley Mfg. Co., 727 F. Supp. 1156, 1161 (N.D. Ill. 1989).

The EEOC concedes, as it did previously, that seeking other employees to volunteer to

work Carter's Sabbath shifts is generally a reasonable accommodation.  EEOC's Brief in Support of Motion for Reconsideration at 7.  However, the EEOC now contends, this accommodation was not reasonable under the facts of this case because Bosch did not do enough to make sure the accommodation succeeded.  According to the EEOC, "Bosch's overtime volunteer process was not reasonable because it was not an effective means for securing volunteers to cover for Carter's Sabbath absences, largely because of Bosch's failure to cooperate in the process."  Id. at 7-8.[3]

The court presumes that the EEOC's argument that the volunteer process was not "effective" represents, in part, a concession that no employees volunteered to work for Carter on his Sabbath.  Apart from this, however, the argument that no one volunteered because Bosch somehow failed to live up to the requirements of the CBA is not supported by evidence that would be admissible at trial.  The CBA provided that a weekend overtime "sign-up sheet will consistently be posted as practicable in each given area of the plant, and will be facilitated in the same manner as the daily overtime."  CBA at 50, Appendix to EEOC's Brief in Opposition, Exhibit 6.  Although the EEOC relies on hearsay testimony of Union representative Sharene

---

[3] The EEOC argues that the employer's conduct is relevant in determining whether an employer's accommodation is reasonable, citing McGuire v. General Motors Corp., 956 F.2d 607 (6th Cir. 1992).  In McGuire, the court concluded that the issue of reasonable accommodation could not be decided on summary judgment, where the employer responded to a union complaint that the plaintiff was being skipped for overtime duty by "surveying" other employees about plaintiff's situation.  Specifically, the employer asked employees to complete two written "surveys" which asked in part whether they favored the plaintiff being given his Saturdays off.  Most of the employees responded negatively, even though plaintiff had previously been able to use vacations, time-off days, and shift swaps to successfully avoid working on his Sabbath for a six-month period.  956 F.2d at 608-609.  The plaintiff argued successfully on appeal that the surveys presented a new situation, making it virtually impossible for him to find volunteers, and the court agreed that the purpose and/or effect of the surveys raised questions of fact, which should be considered in addition to the question of whether the plaintiff himself failed to seek volunteers.  956 F.2d at 610.  The EEOC has pointed to nothing done by Bosch in this case which can be equated with the "surveys" conducted by the employer in McGuire.

Tyler as support for its argument that the overtime lists were not posted between July and September, 2002, <u>see</u> Tyler Dep. at 118, Appendix to EEOC's Brief in Support of Motion for Reconsideration, Exhibit 37, Tyler in fact testified that she personally could not say whether the lists were posted or not during that time period because she "wasn't the steward on the floor at that time." <u>Id</u>. at 11.  Tyler was specifically asked the following: "So you don't know whether or not out of class lists were being posted during that period or not?"  She answered "No, I don't." <u>Id</u>. at 11.  Tyler was also asked, "Do you ever recall a specific time during that period of time where you went to the bulletin board and the list wasn't there?"  She answered, "No, I did not go to the board.  The steward handles the floor so he did the checking as far as what's on the board and checking overtime." <u>Id</u>. at 12.

The union steward at the time was Willie Dumas.  The EEOC did not submit an affidavit or testimony of Dumas in opposing Bosch's motion, although it now relies in part on his testimony in support of its motion for reconsideration.  Dumas Dep., Appendix to EEOC's Brief in Support of Motion for Reconsideration, Exhibit 36.  According to the EEOC, the parties entered into a stipulation that Dumas could be deposed after the close of discovery "[d]ue to difficulties in serving [him] with a subpoena before the close of discovery[.]"  EEOC's Brief in Support of Motion for Reconsideration at 8 n.3.  In its brief filed opposing Bosch's motion after the close of discovery, the EEOC did not indicate that it anticipated a need to rely on Dumas' testimony.  The EEOC likewise failed to file an affidavit as provided by Fed.R.Civ.P. 56(f) after the close of discovery.  Notwithstanding these failures, the EEOC now argues that Dumas' testimony is "newly discovered evidence."

The testimony of a witness cannot be deemed "newly discovered" where a party is aware of that witness before entry of summary judgment but simply fails to protect itself as required by

7

Fed.R.Civ.P. 56(f). However, even if Dumas' testimony may properly be considered in support of the EEOC's motion for reconsideration, the testimony is at best cumulative and at worst supports Bosch's position, insofar as Dumas confirms that he found no volunteers to work for Carter on his Sabbath. According to Dumas, during July through September, 2002, the supervisors in Carter's department posted that they were "100-percent scheduled," including for Saturdays. Dumas Dep. at 29. As far as attempting to recruit out-of-class volunteers, Dumas admitted that he "did not really pursue that process" because, being a "new steward at the time, he was "unfamiliar with that system." Id. at 32-33. At one point, before he had become Union steward, he apparently believed – mistakenly – that it was the supervisors who were supposed to find coverage. Id. Once he became steward, however, he was disabused of this notion, and on different occasions he did attempt to recruit volunteers. Id. at 35. Only once did Dumas specifically ask that a list be posted, and when he did ask, this was done. Id. Dumas was also given some volunteer slips completed by employees, to whom he talked about working overtime. He could not remember whether any of them actually agreed to work on a particular day, although he admitted that he "didn't have much luck finding coverage, because other departments were doing a lot of overtime at the time too." Id. at 37-38. Dumas testified that "people pretty much got burnt out on overtime, and so . . . when they got the opportunity to be off, they would be off." Id. at 54. At times when Dumas did find willing volunteers to work out-of-class overtime, there was no problem with the supervisors accepting the volunteers. Id. at 38-39. According to Dumas, he looked for volunteers only on third shift, primarily because he was the steward for that shift; the other two shifts had their own stewards. Id. at 52, 54.[4]

---

[4]To the best of the court's knowledge, the EEOC has not relied on affidavits or testimony
(continued...)

8

The EEOC argues that Bosch should have provided a "safety net" for Dumas' "inexperience" by meeting its "contractual obligation to get involved in the search for out-of-class volunteers[.]" EEOC's Brief in Support of Motion for Reconsideration at 11. The EEOC argues that Bosch was also obligated by EEOC guidelines to "facilitate the securing" of qualified volunteers. However, the CBA expressly provides that "Management may utilize the assistance of a Union official to ask employees on the list when needed." CBA at 56. Dumas' testimony confirms that this was what occurred. In addition, 29 C.F.R. § 1605.2, on which the EEOC relies, places duties on both employers *and* labor organizations. Subsection (d)(1)(i) of that guideline, on which the EEOC specifically relies, suggests various means of facilitating the use of volunteers, most of which are incorporated into the CBA and were used without success here.[5]

Simply put, the EEOC's argument that Bosch should have relied less on the Union to secure volunteers is premised on a fundamental misunderstanding of the obligations of an employer subject to a CBA and on a lack of familiarity with the particular CBA provisions which governed Carter's employment in this case. Further indication of this misunderstanding is found in the EEOC's argument that Bosch should have entered into a separate agreement with the Union – or "Memorandum of Agreement" ("MOA") – which somehow accommodated Carter. However, because the Union never indicated that it was willing to waive the CBA provisions regarding the assignment out-of-class overtime on a *voluntary* basis, the possibility of entering

---

[4](...continued)
of the Union stewards for the other two shifts.

[5]The EEOC also argues that certain Bosch supervisors "hindered" the Union's ability to secure volunteers because they required that out-of-class volunteers be trained. However, not only does the CBA contemplate that such volunteers will be trained, but the EEOC Guidelines also recognize that volunteers will have "substantially similar qualifications." CBA at 55, 29 C.F.R. § 1605.2(d)(1)(i).

into an MOA with the Union required the procurement by the Union of a list of qualified volunteers – which the Union did not do.[6]  (The EEOC's own submissions indicate that the Union informed that company that a written agreement – such as one which the Union negotiated for Carter when he worked in the foundry – was not possible because the Union could not find anyone who was willing to swap with Carter.  Tyler Dep. at 49-50, 56-57, Exhibit 37, Appendix to EEOC's Brief in Support of Motion for Reconsideration.)  Under the circumstances, the EEOC's attempt to  distinguish this case from Hardison fails.  See id., 432 U.S. at 78, 97 S.Ct. at 2273-2274 (employer agreed to permit Union steward to seek swap of shifts, but steward reported he was unable to work out schedule changes and found no one willing to swap with the employee).

 The EEOC also repeats other arguments it made before summary judgment, including its arguments that Bosch should have explored additional means of accommodation, and that other means of accommodation were available which did not pose an undue hardship on Bosch. However, as this court has already noted, Ansonia holds that an employer is not required to consider and preclude all of the employee's proposed alternatives; only one reasonable accommodation suffices to fulfill an employer's statutory duty.  Opinion and Order at 6.  In any

---

[6]The EEOC's Brief in Support states that "a list of qualified volunteers could have been part of the MOA[.]" Id. at 17.  This statement is followed by a footnote citing to Dumas' testimony for the proposition that a supervisor told Dumas "a few volunteers were coming forward."  Id. at 17 n.8.  However, the EEOC has not identified any volunteers by name, nor has it shown that such persons were available to work Carter's shifts.  According to Dumas, first priority was given to covering medical absences, and then to employees who exercised their right, afforded under the CBA, to be excused from scheduled overtime for up to 48 hours per year. Dumas Dep. at 56-57; CBA at 50.

Interestingly, footnote 8 of the EEOC's supporting brief contains the following boldface statement, which appears to be an internal note of the brief's author inadvertently included in the final draft filed with the court: "**Cite other evidence volunteers were available.**"  This "other evidence" is not, however, cited by the EEOC.

event, what is clear is that Bosch had already accommodated Carter's observance of his Sabbath in other ways, including permitting him to bid into a new position *and* excusing him from 48 hours of overtime on his Sabbath, pursuant to the CBA. The CBA afforded all Union employees "the right to be excused from scheduled overtime for up to forty-eight (48) hours per year." CBA at 50. Plaintiff utilized all of the 48 hours on the following dates in 2002: July 27, August 10, August 17, August 24, August 31, and September 7. Exhibit 7, Appendix to EEOC's Brief in Opposition.[7]

The EEOC also argues that the court's ruling was based in part on a "misunderstanding" of the facts and record, in a number of respects. These include the following: (1) the court found as "undisputed fact that the entire Machine Shop was operating at 100% mandatory overtime capacity"; (2) the court "mistakenly concluded" that volunteers could not be found to cover for Carter; (3) the court was supposedly under a mistaken "impression" that the Union had generated a list of volunteers but failed to present it to Bosch before Carter was fired; and (4) the court "mistakenly found" that Benson James, a company human resources representative, "involved himself" in efforts to accommodate Carter.

---

[7]The EEOC contends that Carter was also entitled to use additional "Personal Absence Allowance" ("PAA") days, which could have allowed him to avoid the unexcused absences resulting in his termination. (This is an interesting argument, considering that the evidence shows that not long before he was terminated, Carter objected to using his "PAA" days to observe his Sabbath. Specifically, in August, 2002 he filed a grievance against Bosch in which he argued that two of the "PAA" days he had already used on his Sabbath should be "returned to him." Exhibit 9, Appendix to EEOC's Brief in Opposition.) However, PAA's are covered in a separate Article of the CBA – Article XVIII – which does not address overtime. CBA at 58-60. Article XVI of the CBA, in contrast with Article XVIII, expressly addresses the subject of overtime and permits employees only 48 hours per year of *unpaid* leave from overtime. Carter's attendance record seems to indicate that he was paid for his 48 hours of excused overtime, even though the CBA specifies that this time is to be treated as unpaid leave. Exhibit 7, Appendix to EEOC's Brief in Opposition. What is clear, however, is that Carter used all of the excused overtime hours which the CBA permitted him to take.

The EEOC does not explain how any of these supposed "mistakes" resulted in an incorrect application of the law. In its ruling on Bosch's motion for summary judgment, the court did not *find* any facts at all; rather, the court merely determined whether, as provided by Fed.R.Civ.P. 56(c), genuine issues remained as to any material facts. Not all factual disputes are "material." Instead, materiality is define with reference to the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

In its decision granting summary judgment in favor of Bosch, the court did note that the parties did not dispute that the machine shop, where Carter worked, began operating "100% capacity" in July, 2002. Opinion and Order at 3. This statement is taken virtually verbatim from the EEOC's own submissions. See Declaration of Jeffery L. Carter, Exhibit 2, Appendix to EEOC's Brief in Opposition (docket no. 46), ¶ 7 ("In July 2002, after both plants were shut down, the Machine shop began operating in a 100% situation. This meant that the machine shop operated 24 hours a day and seven days a week, requiring mandatory overtime"); Declaration of Andre Holmes, Exhibit 3, Appendix to EEOC's Brief in Opposition (docket no. 46), ¶ 6 ("In July 2002, after both plants were shut down, the Machine shop began operating in a 100% situation. This meant that the machine shop operated 24 hours a day and seven days a week requiring mandatory overtime for everyone in this plant"). In concluding that this factual issue was undisputed, therefore, the court viewed the facts in the light most favorable to the EEOC as non-movant.

Changing its position on the 100% overtime issue in seeking reconsideration, the EEOC now relies on different evidence on which it did not rely before, including portions of the deposition of Sharene Tyler and Gregory Hulen. However, the EEOC did not include these

particular pages of Tyler's deposition (pages 63-64 and 125) or Hulen's deposition (pages 16-18) with the previous briefs it submitted in opposition to Bosch's motion. In further support of its new position, the EEOC also relies on portions of the deposition of Willie Dumas. However, this reliance is cumulative, insofar as the same information was supposedly included in Tyler's deposition, which the EEOC did previously have but failed to present the relevant portions in response to Bosch's motion. Under the circumstances, the EEOC can hardly fault the court for viewing the facts in the EEOC's favor at the time of its ruling.

The EEOC now also argues that the court "mistakenly concluded" that no volunteers could be found to cover for Carter on his Sabbath. However, the evidence cited by the EEOC in support of its motion for reconsideration does not create an issue of fact regarding the existence of willing and able volunteers. Even the "new" evidence on which the EEOC in part relies – portions of the deposition of former Union steward Willie Dumas – indicates that the Union did not find volunteers. The court did not err in its conclusion that the evidence did not create a genuine issue of fact because it failed to show that other employees were both willing and able to volunteer for Carter on his Sabbath.

The EEOC also expresses the view that the court was under a mistaken "impression" that the Union had generated a list of volunteers but failed to present the list to Bosch before Carter was fired. In its decision, the court did refer to hearsay testimony by Carter that he had been told by Union bargaining committee member Andre Holmes that the Union had a "list" of employees who might be willing or able to work. Opinion and Order at 11. However, the court followed this reference with another reference to Holmes' actual testimony, in which he confirmed that he

13

personally never tried to find anyone to work overtime for Carter between July and September, 2002.  Id.

Because the EEOC takes the position that no list even existed (if at all) until after Carter was fired, it is unclear why the EEOC raises the issue of the supposed list in its current motion, except perhaps to point out that Holmes, who was not a union steward in the machine shop, was unlikely to have been involved in the actual process of procuring volunteers in that area. EEOC's Brief in Support of Motion for Reconsideration at 26 n.14.  The "new" testimony of Union steward Dumas confirms that he never procured a list of volunteers.  In addition, the only evidence of a purported "volunteer list" the EEOC presented was an unsigned list of persons who had supposedly volunteered to work for Carter, composed *after* he was fired, which included persons who were qualified to work in the foundry, not in the machine shop where Carter worked at the time of his termination.  Exhibit 31, EEOC's Supplemental Brief in Opposition (docket no. 73).  The EEOC has not presented either affidavits or testimony by these employees to confirm whether they would in fact have been willing and able to work Carter's Sabbath shifts in the machine shop.[8]  In sum, the court was not under any mistaken impression about the availability of volunteers.

Finally, the EEOC argues that the court "mistakenly found" that company human resources representative Benson James "involved himself" in efforts to accommodate Carter. According to the EEOC, the court "misunderstood" the "dialogue" between the Union and James.  EEOC's Brief in Support of Motion for Reconsideration at 26.  However, the EEOC

---

[8]As the court has already observed, see note 6 *infra.*, the EEOC has neglected to cite to supposed "evidence" identifying volunteers.

14

points to no actual mistake of fact, nor does it show how correction of this supposed mistake requires a different disposition. Clearly, there was a dialogue between the Union and Bosch, as part of which James expressed the company's willingness to accommodate Carter through an arrangement similar to that which had been made when Carter was employed in the foundry. The question presented by Bosch's motion was whether Bosch had shown that it offered Carter a reasonable accommodation, not whether the company initiated a dialogue with the Union, or whether the company should have engaged in more dialogue with the Union and offered additional accommodations. The EEOC's argument does not provided a basis for reconsideration of the court's ruling.

## Conclusion

As the majority noted in Smith,

> Undoubtedly, one means of accommodating an employee who is unable to work on a particular day due to religious convictions is to allow the employee to trade work shifts with another qualified employee. Other circuits have held that when an employer allows such a trade, it has reasonably accommodated its employee.

827 F.2d at 1088 (citing Brener v. Diagnostic Center Hosp., 671 F.2d 141, 146 (5th Cir. 1982) and United States v. Albuquerque, 545 F.2d 110, 114 (10th Cir. 1976)); see also Moore, 727 F. Supp. at 1160 (concluding "that the system of voluntary swaps instituted by the defendants was a reasonable accommodation," noting existence of "considerable authority to support this position") (citations omitted). An employer has met its obligation when it demonstrates that it has offered a reasonable accommodation to the employee. Ansonia, 479 U.S. at 69, 107 S.Ct. at 372. The EEOC and Carter have simply failed to show that a genuine issue of fact remains whether the accommodation offered – seeking qualified volunteers to work for Carter – was

15

reasonable, as it generally is under the law.   Because the plaintiff and plaintiff-intervenor have not convinced the court that it erred as a matter of law in granting Bosch's motion for summary judgment, the court **DENIES** their motions for reconsideration.

So ordered this 28th day of April, 2005.

     /s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge